May it please the court, Allen Middleton, Davis Wright, Tremaine, representing the appellants in this matter. As the court knows, we are here today based on a case in which really only two causes of action remain. Washington State claims, one is an inverse taking claim under the Washington State Constitution. The other is a claim for violation of federal justice rights doctrine, RCW 6440. Counsel, would you please raise your voice? I'm sorry, Your Honor. Don't cry, I have that habit. Last week, the Washington State Supreme Court decided the case of Biggers v. City of Bainbridge Island, that's docket number 77150-2. It involved a moratorium enacted by the city of Bainbridge Island, and I wanted to bring it to the court's attention simply for the purpose of highlighting to the court what was the obvious frustration of the Washington State Supreme Court with actions similar to the actions that were undertaken by the city of Selah in this case. In that case, it was a series of moratoriums against shoreline development. And the court at page three of the slip opinion said, the city justified its moratorium, which by the way lasted over three and a half years, by arguing that any new construction permitted may harm the shoreline habitat. This rationale cites potential harm rather than actual demonstrated harm. Standing alone, theoretical harm is not enough to deny private property owners fundamental access to the application review process or protection and use of their property. I think we need to keep that statement of the Washington State Supreme Court in mind as we consider these state law claims. As I said, this is in part what this case is about, a delay over the course of five years by the city of Selah in approving a subdivision development, the last three phases of that development, based upon an alleged policy banning the use of booster pumps to improve pressure in a water system. One thing needs to be clear, there was never a scarcity of water here, never a scarcity of the commodity itself. Instead, there was an alleged lack of water pressure to serve higher elevation developments. The city has taken attack in its response to argue that it is largely operating in its proprietary capacity as the owner of its own utility. It's trying to persuade this court that it was simply looking out for the integrity of its system. Unfortunately, the city cannot wear two hats in this proceeding. It is, yes, a utility, but in this proceeding, it was the determinant, the decider in a quasi-judicial process governing the application for a subdivision permit. It is not permitted to go over into its proprietary capacity and import ad hoc decisions from that proprietary capacity when the regulations, the laws are clear that what the city has to apply are adopted regulations.  In considering a subdivision proposal, Washington law is clear that the city cannot rely on ad hoc decision making. It cannot rely on statements of policy. It must adopt a development regulation that clearly implements the policy. And so, you've seen the city referred to its 2,000 comprehensive water plan. That is not enough to constitute a regulation that is then entitled to apply to this proposal. I also have problems with the language of that policy. It is only a recommendation. It says the city should consider higher elevation storage or should consider essentially not approving development until the higher elevation storage is in place. But that's not enough. That is not a development regulation. It is not a regulation that says that booster pumps are not permitted. At no time has the city of CELA actually undertaken to pass an ordinance or a development regulation that bans the use of booster pumps. Mr. Miller, would you spell that out a bit? I had a little trouble kind of getting my hand around your argument that there was not an ordinance. Why does there need to be an ordinance on something like a booster pump? I think the rationale is spelled out in the Norco case, which was actually quoted at length in the briefing. But it essentially says that a developer is entitled, needs to know how to comply with the subdivision ordinance. In fact, the Norco decision is very interesting because it specifically refers to the section of the subdivision statute that Mr. Tierney relied upon where an applicant is supposed to provide for welfare, that sort of thing, and what Norco said was that is not a blank check to impose on a developer ad hoc policies, things that are decided case by case. And so I think that the rationale the Norco court gave was that a developer is entitled, needs to know what they need to do to comply with the statute. So I think it's really a notice issue, it's a fairness issue, it's a due process issue. Letting the developer know what they need to comply with. As it is, the city has never in this process been able to come forward with a written policy in any way, shape, or form. Instead we have statements that such a policy, well actually it doesn't even say that that policy exists. It says the city council has decided informally, because no ordinance has been produced, that high elevation development will be prohibited until such time as they've built a high elevation reservoir. And that's as far as it goes. Is it your position that there has to be a municipal ordinance that says exactly that? You can't have high elevation development without a high elevation reservoir and you cannot use booster pumps. What the city should have done was it should have passed an ordinance or designed regulations authorized by ordinance that say under what situations a booster pump would be permitted and under what situations it would not. What kind of conditions might be imposed to permit use of a booster pump, that sort of thing. As it is- Assuming that that would have been a good thing to do, is there any case law that would require the city to have a regulation or an ordinance? I think the Norco decision is- Are you referring to which Norco decision? There were two in 81 and one in, I believe if I'm correct, one in 81 and one in 82. Could you point to which one and where it says that? 1982, it's the extended discussion in the brief. It's a lengthy quotation in the brief. All right. And- I guess I just don't read it as saying that a city or a municipality cannot deny an application on public interest grounds if it hasn't adopted a regulation explicitly on the point. What it did say was that if there is a city regulation that specifically does something, then an application can't be denied on effectively the same grounds that the regulation would have allowed. I think we have to recognize that at the time this application was submitted, and at the time it was considered in 1999, and frankly again in 2001, there was no regulation or ordinance barring the use of booster pumps. There was none. Booster pumps are lawful in the state of Washington. They are approved by the Department of Health. There was nothing illegal about them. And all of the city's reservations, frankly in the testimony, could have been overcome by everything that Mr. Johnson offered in terms of backup power, in terms of a backup pump to overcome any kind of mechanical difficulties. Well, let me see if I understand what you're saying. Does a developer have a vested right to put anything on his property so long as it's not expressly forbidden in writing at the time, the rights vest? I think that's the implication of the vested rights statute. Otherwise, the vested rights statute really doesn't mean anything. I mean, you are entitled to the free use of your property unless and until government tells you that you cannot make this particular use of it. And at no time, frankly, even until today, has the city of Selah taken the position in writing that the booster pumps are disallowed.  But even after the 2004 approval related to this specific property, approving use of a booster pump, the city approved the use of a booster pump on another of my client's properties. The idea that a ban on booster pumps was some way related to the public health, safety, and welfare is simply not true. Well, that other property was separate. It was. Yeah. All right. With that, I think I'll reserve whatever seconds I have left. Certainly. Mr. Tierney? Good morning, Your Honor. I'm Mike Tierney for the city of Selah. I was speaking to Mr. Middleton before we started about how I still carry the excerpts of record to court. I've never had occasion to use them, but it's sort of like a security blanket for me. And on this occasion, I did have a cause to refer to them. One thing that has to be made clear at the beginning of our discussion is just what the basis for the moratorium was. And I think that what was just described is completely factually inaccurate. And I referred to the record just to make sure that I knew what I was talking about. And this is found in the declaration of the city's outside consulting engineer, Jeffrey Lohman. And it's found in the record at ER 465, excuse me, 465 to 472. The moratorium wasn't simply over water pressure. In fact, it wasn't over water pressure at all. What happened was in the course of preparing its required comprehensive water plan, which is done I think every six or maybe eight years according to state regulations. The city analyzed its overall storage capacity in its entire system. It's required, as Mr. Lohman says, to be able to store two days worth of water for typical uses, and I know that that's complicated. There's descriptions of what an ERU, an equivalent residential unit, is and how much water that takes. But the point was that we have X amount of storage capacity and we need X plus. We are already past our limit in what we use as water compared to what we have in storage capacity. And in the report that was done in 1999, completely independent of Mr. Johnson's, of the plaintiff's development proposal, this was being done. And the engineer said, well, we can adjust the pump running times basically to keep the reservoirs fuller or to supply power, our water right out of the wells. And we can buy ourselves a little more storage capacity. But unfortunately, the amount that we can buy ourselves in additional capacity is already spoken for in the form of projects and developments that have already been approved and which we expect to use up that capacity. And that's all laid out in Mr. Lohman's report. So the crisis for the city at that time was not water pressure, it was water storage in general. There was not enough water for the plaintiff's development. And it's also in the second declaration of Robert Sweet and the second declaration of Joe Henney, the city's utilities director, that describes the problems that the city had and what it was facing at that time. And really, the moratorium in some senses was almost unnecessary because if, for instance, the plaintiff's development had been allowed to proceed, it would have come before the city council. And the city council would have had to look at its checklist and say, well, we have to decide that this makes adequate provisions for water supplies. And we already know we don't have enough water. So we have to deny your subdivision proposal. Mr. Tierney, your adverse counsel says there was plenty of water. You say there was a shortage of water. If that's an issue that's critical to the outcome of this case, isn't that a fact question that should survive a motion for summary judgment? It would be if there was anything in the record that said the city had any contention from the plaintiff that said the city had adequate water. That was never any contention. And that's what I was going to get to on this, is that the city put its moratorium in place and it said, well, we really have two problems here. One is overall storage capacity. The other is how do we deliver water pressure to these higher level developments that are starting to come into play? Let me go back to the moratorium just a second so I can finish up the issue that I have here. A developer who files an application for a subdivision has a right to depend upon the zoning, planning, and land use regulations that are in play at that time. Isn't that right? That's correct. And what I'm understanding you to say, and what I kind of understand from the briefing here, is that this moratorium depended upon a comprehensive water plan that was developed after that. So you have, if they had the right to depend on the comprehensive water plan that was in play, and your responsibility to provide water under state law, how do you then, after the fact, so to speak, pop this moratorium on them that holds them up for several years? Well, I think the answer to that is in the way, what you posed in your question. The developer has a right to rely on land use, zoning, and I forget what the other term you used, ordinances or regulations that are in place at the time. This is not one of those. This is an ongoing evaluation of the city's water capacity. And the example I used in my brief was, I mean, the problem that the city discovered is no different  and the city had this in another development that it had annexed, the Goodlander Heights, where that had a private water system and the well ran dry. And that's when the city had to install a booster pump because that was the only way to get water to that area. So it isn't a land use regulation. It's the city's management process of its city-owned utility that the comprehensive water plan addresses. And you bottom this upon your police power, the safety, the lack of pressure that's present with their plan? Or what's your trade-off power to do this limitation against their right to use the property to its highest and best use? Well, there's two responses to that. One, their right to use their property is one thing. The city's right to design its water system is another. And what they're trying to do is bootstrap, well, my right to develop my property means I get to tell you what sort of installations you put in your city-owned utility. There's no connection there. That's not a property right. The property right is in developing your property. The city's not talking about what you're putting on your property. The city's talking about using a booster pump that exists in another location to supply water to your property. So that's one thing. And I'm sorry, I just lost my train of thought on the first part of your question. Your authority under the police power? I can't really imagine much more of a police power that goes to protecting health and safety than providing drinking water and fire protection to its citizens. I think that is a quintessential police power and a quintessential health and safety consideration of the government. And what's especially interesting here is it's not something the government is imposing on anyone else to do. The government is saying this is what we are doing with our city-owned utility. This is how we are running our water system. Now, that is as much health and safety as any regulation can be. And back to the point of the moratorium and the issue of fact. What the plaintiff challenged in this case was whether, and the only issue of fact that there was, and even that, as we point out in our brief, was incomplete, was that the booster pump would provide pressure to his system. But it is undisputed that booster pumps do nothing to provide storage capacity. You've got this system running over here that is already out of enough storage capacity. You can take a pump and pump water from that system directly to other houses, and you might provide them pressure. But you do nothing to provide additional storage capacity. And that's what the undisputed issue was. Nobody challenged the moratorium. Nobody challenged those legislative findings. Those are a matter of undisputed fact. The only fact that the plaintiff challenged was whether they could provide enough pressure. And even at that, and we point this out in our brief, and I'd have to look up the reference, but I think it was 463, ER 463, no, it's ER 301. The plaintiff's engineering report said we can provide pressure, and we are left with, I believe it was 1,071 gallons for fire flow. But the requirement in the planning commission was for 1,750 for fire flow. So there was inadequate fire flow, even on the plaintiff's engineering report. So the one other thing I would like to quickly point out is, even to the extent the plaintiff is arguing that there is some sort of duty on the city to provide water. If you look at the cases, and I'm thinking of the West Valley Yakima versus West Valley Fire District, that analysis of the city's duty is an implied contract analysis. That there's an implied contract if the city is the only supplier of water, or holds itself out of supplying water. That plaintiff might have, under the right circumstances, some sort of breach of contract analysis against the city. But that does not constitute a property right inherent in the ownership of his property. And that's what's being alleged as being taken here, is a property right. Not a breach of the city's implied contract to provide water. Okay, all right, thank you, Mr. Tierney, Mr. Middleton. How many seconds do I have? 44. Okay, thank you. I frankly wouldn't have predicted this argument would go in quite this direction. But I wanted to address some of the things Mr. Tierney addressed in his remarks. In fact, the city planning commission and its staff made findings that there was adequate water at every relevant time. 1994, 1995, 1999, 2001, 2004. At the very least, I think this creates a fact issue that needs to go back to the trial court. Mr. Tierney's again trying to portray the city as a utility. The comprehensive water plan was not generated because the city is a utility. All cities subject to the Growth Management Act were required to prepare a comprehensive water plan. It is in even cities that don't have their own utilities. This was not an exercise to go about designing the city utility. This was looking at the city's city-wide water needs and planning in policy terms as to how to meet those. And so to try and take this out of the realm of zoning regulations against which this application would invest just doesn't work. This was a zoning enactment. Thank you. Thank you, Mr. Middleton. Thank you. Both counsel, a matter just argued will be submitted.
judges: Nelson, Rymer, Beam